

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00020-CV

_____

IN THE INTEREST OF J.G., A CHILD

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-643424-18

Before Sudderth, C.J.; Kerr and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

After a bench trial, the trial court found by clear and convincing evidence that (1) Appellant Father[1] engaged in conduct or knowingly placed his young son J.G. (Joshua) with persons who engaged in conduct that endangered his physical or emotional well-being; (2) Father knowingly placed or knowingly allowed Joshua to remain in surroundings or conditions that endangered his emotional or physical well-being; and (3) termination of the parent-child relationship between Father and Joshua was in Joshua's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (2). In his sole issue, Father contends that the evidence is legally and factually insufficient to support the best-interest finding against him. Because we hold that the evidence is legally and factually sufficient to support that finding, we affirm the trial court's judgment terminating Father's parental rights to Joshua.[2]

## I. BACKGROUND

The events leading to Joshua's removal and the ultimate termination of Father's parental rights occurred or became known in the summer of 2019, after Joshua's first birthday in April. Joshua was Father and Mother's only child together. Joshua lived

---

[1]We use aliases to refer to the child subject of this appeal and his family. *See* Tex. R. App. P. 9.8(b)(2) (requiring courts to use aliases to refer to minors in parental-rights termination cases and, if necessary to protect the minors' identities, to also use aliases to refer to their family members); *see also* Tex. Fam. Code Ann. § 109.002(d).

[2]The trial court also terminated the parent-child relationship between Mother and Joshua. Mother does not appeal.

with his parents, Father's teenagers from other relationships, Mother's teenagers from other relationships, and her six-year-old (Tara) and four-year-old (Charles) from another relationship.[3] Father's fourteen-year-old son, Justin, was one of the teenagers who lived in the home. Justin suffered from mental illness. He had post-traumatic stress disorder, attention deficit hyperactivity disorder, bipolar disorder, depression, a mood disorder, a learning disability, and a low IQ.

In early July 2019, when Mother and Father had been married about a year, a Child Protective Services (CPS) investigator was assigned to investigate because Mother, who had extensive CPS history, had tried to kill herself in the home while the children were in her care. Specifically, on July 8, 2019, Mother swallowed 15 Tylenol-3 pills. Some of the teenagers were at home, as were the three young children. After she took the pills, Mother directed Justin and one of the other teenagers to call 911. Mother went to the hospital; she told the CPS investigator that the hospital released her in less than twenty-four hours with a recommendation to get counseling. At trial, the CPS investigator did not recall that Mother had been diagnosed or prescribed any medication. Father claimed at trial that Mother had spent a few days in a mental hospital, but he did not know whether she had any follow-up treatment.

---

[3]Mother's parental rights to Tara and Charles were also terminated in the underlying trial, as were their father's. Neither he nor Mother appealed that decision.

Mother was the children's primary caregiver because Father, an electrician, worked and stayed out of town during the workweek. He came home when he was notified of Mother's suicide attempt but went back to work soon thereafter. The investigator testified that Father had showed no concern that the children remained in Mother's care after her suicide attempt. The investigator further testified that Mother's suicide attempt placed all the children in the home at risk because they were unable to care for themselves.

Father's counselor acknowledged at trial that it could be endangering to place children in the care of a suicidal person. She testified that Father admitted to her that he had known Mother was suicidal when she was the children's primary caregiver and that it endangered them. Father testified, however, that the children were not endangered when he left them in Mother's care when she was suicidal because his oldest son in the home, who was eighteen years old at the time, had a cell phone and could have contacted Father if necessary.

The Department of Family and Protective Services offered the family services through Family Based Safety Services (FBSS), but CPS received another referral before the case could be transferred to FBSS. On August 12, 2019, Father called 911 and reported that Mother was trying to leave the house with the children and that she and Justin had been having sex. Father called 911 again later that same night to report that he had misunderstood and that the sex was consensual. Father subsequently said that he made this second call because he did not want Mother or

Justin to get into trouble and did not want his children to go into foster care. At some point that night, Father, who was drunk, punched Justin.[4] Father was arrested that night for injury to a child and for the offense of unlawful restraint based on allegations that he stopped Mother from calling 911.[5] The CPS investigator testified that Father's blocking Mother from calling 911 was concerning because should the children need emergency help, Father might likewise prevent their receiving that aid.

That same night, after Father's arrest, Justin made an outcry of sexual abuse against Mother. Joshua, Tara, and Charles were then removed and placed in foster care.[6] Mother was arrested a few days later and charged with continuous sexual assault of a child, and an indictment was pending against her at trial. She admitted to the CPS investigator that she and Justin had sexual intercourse but claimed that they had both been very drunk and that Justin had raped her.[7]

---

[4]Although Father admitted to the police that he had punched Justin, at trial, he denied doing so on the night of his arrest. Father's counselor testified that he had told her that he had not punched Justin.

[5]An indictment charging Father with injury to a child was pending at trial. No evidence indicated the status of the unlawful-restraint charge.

[6]Justin and his teenaged sister were also removed, and Father's parental rights to them were ultimately terminated in a separate proceeding.

[7]According to Father, Justin was as tall as Mother, but she outweighed him by 140 pounds.

Evidence conflicted on how long Father had known about the sexual abuse before he reported it; most of the conflicts were a result of Father's differing statements to law enforcement, the CPS investigator, the caseworker, and his counselor and at trial.

The CPS investigator testified that Father had stated in his law-enforcement interview that the sexual abuse had started three or four months before his arrest and that he had learned of it when it began because Mother had called to tell him that Justin had "confessed to raping" her. Father told the CPS investigator (and testified at trial) that he did not know until the day of his arrest about the sexual abuse.

Father initially told the caseworker that he had found out about the sexual abuse "recently" when Justin told him. However, Mother later told the caseworker that Father had known in June 2019 that she and Justin had engaged in sexual relations. When the caseworker confronted Father with Mother's statement, he admitted that he had known about the sexual abuse before the day he called the police but told the caseworker that he had not wanted to tell anyone because he had not wanted Mother or Justin to get into trouble and had not known what to do.[8] Father told the caseworker "that when he[] . . . came home most days, it was just awkward, and he knew something was wrong deep inside." Similarly, he testified that he had felt

---

[8]Father testified that he called the police the second time because he was trying to get more "information before pushing forward."

6

concerned "[b]ecause [of his] gut" before the day of his arrest, but he also insisted that he had not observed anything that caused those concerns.

Father told his counselor that he

- suspected Mother and Justin were having a sexual relationship when he walked into the bedroom and saw them lying in bed together and whispering;

- then believed that he had been wrong;

- then learned that the sexual abuse was in fact occurring;

- called law enforcement a "short while" later; and

- regretted not calling the police "right away."

The counselor did not know how long Father waited to call the police. However, she testified that he told her that Justin had lied when he reported that Father had known about the sexual abuse beforehand.

Father testified that he called the police "within [thirty] minutes once [he] tried to find out the details. [He] was wanting to know what the hell was happening in [his] home."

The CPS investigator believed, based on her investigation, that Father had known that the sexual abuse was ongoing because Mother and Justin did not try to hide it from him. Even if Father had not found out until the day of his arrest, however, his second 911 call concerned the investigator because a minor cannot consent to sex and because it indicated a risk that he would likewise fail to report other misconduct out of fear that his children would be placed in foster care. Father's

7

counselor testified that if the evidence showed that he had referred to the sexual abuse as consensual in his second 911 call, it would concern her because as a minor, Justin was a victim regardless of his actions. At trial, Father denied saying "consensual" in the second 911 call.

Through discussions with the children, the CPS investigator discovered that two of the other teenagers had known about Mother's sexual abuse of Justin, and Father told the police that other children in the house must have known about the sexual abuse. Father's counselor also testified that Father reported to her that the other children in the home knew about Mother's sexual abuse of Justin.

The CPS investigator testified that based on her investigation, Tara, Charles, and Joshua did not know about the sexual abuse, nor did any evidence indicate that Mother had sexually abused them. Nevertheless, the CPS investigator testified that what the teenagers told her—which was not developed at trial—caused her to worry about the three youngest children's safety. She further testified that Father's allowing the sexual abuse to continue endangered them. She explained that the sexual abuse of Justin was a threat to the three young children because they could have been exposed to it and because Mother and Justin were intoxicated during the sexual abuse, creating an unsafe environment for the young children.

Father's counselor agreed that Father endangered Justin by allowing him to be sexually abused and that Father endangered all the children by waiting "a short while" to report the sexual abuse and by allowing Mother to continue taking care of them

8

while she was abusing Justin. The counselor explained that the danger was the risk of sexual abuse and emotional abuse. Father admitted in his testimony that by telling the police that there had been a misunderstanding, he was denying the sexual abuse and that his denial endangered the children.

Father had difficulty holding Mother responsible for the sexual abuse of Justin. Father told the police that he had known that she and Justin slept next to each other when Father was out of town because he saw them when he came home from work, but he thought she was just comforting Justin in Father's absence. Justin had told Father that he was in love with Mother. Father told the police that he believed that "all the sex between" Mother and Justin occurred as a result of Justin's raping Mother. However, Father also told the police that Mother had bought Justin lubricant and sex toys, that she would give Justin alcohol and marihuana,[9] that her drug and alcohol abuse had caused the sexual abuse, and that she should go to jail.

When Father spoke to the caseworker in July 2020, though, he was noncommittal. She told him that the sexual abuse had not been Justin's fault, which Father acknowledged. However, Father told his counselor many times that Mother had told him that Justin had raped her. Even at trial, when asked what his impressions

_____

[9]Mother told the CPS investigator that it was Father who had given Justin alcohol and marihuana, and some of the children confirmed that Father had given Justin alcohol. Regardless of which parent provided the drugs and alcohol, the conflicting evidence indisputably showed that Father knew Justin was drinking alcohol and smoking marihuana and did nothing to prevent it.

were concerning the sexual abuse, Father answered, "Honestly, I don't know." He also initially testified that he did not believe that Mother had raped Justin but that he did believe that Justin could not consent as a minor. Father then defined rape to be forcible or nonconsensual sex and decided that under his definition, Mother had raped Justin.

Mother told the CPS investigator that Father was suicidal. The CPS investigator discovered that Father had attempted suicide twice almost three weeks after Mother's attempt. Father tried to kill himself once by hanging himself with his belt and another time by stabbing himself. He was sober at the time. The children were at home during both attempts. Justin saw both attempts. Mother stopped Father from hanging himself, and Justin took the stabbing instrument away from him.

In an August 15, 2019 interview, Father told law enforcement that he had tried to kill himself more than once and currently wanted to kill himself. Father later told his counselor that when he tried to hang himself, "he was suffering a lot of stress from being broke but still working very many hours[;] . . . he had been threatened with divorce[;] and he felt like he was losing everything, felt hopeless, and . . . at the time really wanted to die[.]" Afterward, he felt "selfish" and "stupid." Father did not tell his counselor about trying to stab himself. At trial, the counselor did not think Father was suicidal. Rather, she believed that he had resolved all the issues that had made him suicidal. However, she admitted that his attempting suicide had endangered the children.

The trial court heard evidence that Father had issues with alcohol and violence. He was drunk when he punched Justin. Father told the caseworker that when he punched Justin, he was also reacting in anger. In addition to punching Justin on the day he was arrested, Father punched several holes in a wall of the home.

Father admitted in his law-enforcement interview that he had a problem with alcohol, stating that he sometimes drank more than eight or nine shots of whiskey and a six-pack of Bud Lite. The CPS investigator was concerned about how much alcohol Father drank at one time. She testified that after drinking that much, he would be too drunk to show good judgment or to be a good parent. At that level of consumption, Father would not be able to safely provide parental care to the younger children, who needed an adult caregiver to meet their daily needs. The caseworker also testified that Mother believed that Father should not regain possession of Joshua because of Father's anger issues. Mother told her that Joshua was too young and small to defend himself.

The trial court also heard evidence about the conditions of the three young children and the house. The CPS investigator testified that the children showed signs of neglect. When she first visited the home in July 2019, they were very dirty. Mother had shaved Tara's and Charles's heads because they had lice. The children were also very small and had poor hygiene.

The CPS investigator was concerned about the children's mental health. They did not behave like typical children would at their respective ages. Specifically, Joshua

"was very quiet. He just kind of sat there and observed everything. He didn't really want to play or do anything like a one-year-old. He wasn't crawling. [The investigator] didn't see him walk at any point."

The home was also neglected. When the CPS investigator first saw it in July 2019, the home, like the children, was very dirty. When she went back at the time of the August 2019 removal, it was in disarray. In addition to the holes in the wall, the investigator saw a whole pizza lying upside down on the floor, cigarette ashes scattered on the floor, and bugs crawling everywhere. Old food, dirty dishes, and dirt covered the kitchen counters. Joshua's bedroom was so cluttered that she could not open the door widely enough to enter, but she saw that the crib was filled with clothes. When the police entered the home in August, they had to wear hazmat suits. The investigator testified that the home's conditions were unsafe for Joshua.

Father's counselor knew nothing about the conditions of the home or the conditions of the children at the time of removal. Father never expressed a concern about such conditions. She testified that reports that the children were dirty and unkempt and that the house was not in good condition for them to live in would concern her.

## II. JOSHUA'S BEST INTEREST

Father does not challenge the endangerment findings against him. Instead, in his sole issue, he challenges only the sufficiency of the evidence supporting the best-interest finding.

12

## A. Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination—here, the Department—must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802. Because Father does not challenge the sufficiency of the evidence supporting the endangerment grounds found by the trial court, we confine our analysis to the evidence supporting the best-interest finding.

To determine whether the evidence is legally sufficient to support the best-interest finding, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could form a firm belief or conviction that termination of Father's parental relationship with Joshua is in the child's best interest. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is

contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's best-interest finding and do not supplant it with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the termination of the parent–child relationship between Father and Joshua would be in Joshua's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## B. Law on Best Interests

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*,

402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may examine in determining the child's best interest:

(A)   the [child's] desires . . . ;

(B)   the [child's] emotional and physical needs[,] . . . now and in the future;

(C)   the emotional and physical danger to the child now and in the future;

(D)   the parental abilities of the individuals seeking custody;

(E)   the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F)   the plans for the child by these individuals or by the agency seeking custody;

(G)   the stability of the home or proposed placement;

(H)   the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)   any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor

may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## C. Analysis

### 1. The Dangers Associated with Returning Joshua to Father

The most compelling evidence of Joshua's best interest is the endangerment evidence because it allowed the trial court to find that Father had failed to protect his children in the past and that an unacceptable risk existed that he would continue to fail to protect Joshua in the future if Joshua were returned to him. Generally, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). While such evidence is generally considered in evaluating the predicate grounds for termination, it is also relevant in determining whether a parent poses a present or future risk of physical or emotional danger to the child. *In re K.A.S.*, 131 S.W.3d 215, 229–30 (Tex. App.—Fort Worth 2004, pet. denied) (noting that trial court can measure future conduct of parents by their recent past conduct).

The evidence showed that Father exposed Joshua to danger and instability before Joshua's removal by not reporting Mother's sexual abuse of Justin; by leaving the baby in Mother's care after her suicide attempt without ensuring that she was mentally well; by attempting suicide himself and doing it while the children were in the home; by failing to control his temper and his use of alcohol, resulting in his

16

punching Justin and punching holes in the wall; and by leaving Joshua in an unsafe environment.

The most critical factor appears to be Father's failure to protect. The CPS investigator testified that Father had no concerns about Mother as a caregiver to his children until after the children were removed.

The trial court also heard evidence upon which it could determine that Joshua faced future endangerment risks if returned to Father. Father could not seem to let go of Mother. His counselor testified that it had been very difficult for him to accept that Mother had hurt the children and that currently, it was "very difficult for him to not try to please her in many different situations." Father testified that he was not angry with Mother for sexually abusing Justin.

As of January 2020, Father continued to have almost daily contact with Mother while she was in jail despite telling the caseworker that he had no contact with Mother. The caseworker was concerned because Father's inability to stay away from Mother indicated that he was unwilling to protect Joshua. Father's counselor believed that he was still in denial about the sexual abuse, but she admitted that he tried to hide his visits with Mother from the caseworker because he knew they were wrong.

In June 2020, after Mother was released on bail, Mother and her boyfriend were guests in Father's home. Father told the caseworker that he had just been "tr[ying] to help them" and that they had come to his house for cigarettes. The caseworker testified that even though the children had already been removed, Father's

hosting Mother was a sign that his "protective capacities were off." His counselor testified that she had told Father that he was not making good choices or showing that he could be protective of the children when he let Mother and her boyfriend in his house and continued to try to please Mother. He had admitted to the counselor that he should not be around Mother.

Finally, a week or so before trial, Father's counselor learned that he had sent videos of Joshua to Mother on several occasions because he felt sorry for her and knew she missed the little boy.[10] The counselor did not believe that Father thought sending Mother the videos would hurt Joshua, but the counselor admitted that Father's continued contact with Mother—even texting her about Joshua—was contact. Father's coworker testified that Father's actions would concern him because he "would [not] be able to have any contact with someone like [Mother] if that happened to [him]." The caseworker testified that Father's sending the videos showed that regarding Mother, Father's "protective capacity" was "questionable." The caseworker explained that Father's continuing contact with Mother after he knew that she had sexually abused Justin showed that he was not protecting Joshua. The caseworker also testified that the continued contact showed that Father still wanted a relationship with Mother despite her sexually abusing his son.

---

[10]Mother told the caseworker that she had asked Father several times to stop sending the videos.

Father testified that one reason he sent Mother the videos was that he was "follow[ing his] heart" and trying to do what he "thought was right." He learned that his choice had been bad when his counselor told him so; he testified that he "guess[ed]" that it was not something that he could or did conclude on his own. He admitted that it was fair to say that he sent Mother the videos of Joshua because he thought she should get to see the child. Father ultimately testified that his sending the videos to Mother was not contact and that if the court returned Joshua, Father would not allow Mother to come to his home to see Joshua or to take him anywhere.

Father also testified that he sent Mother the videos because she had been cooperative about the divorce. However, no divorce petition had been filed, and Father had never mentioned to the caseworker that he wanted a divorce. On the other hand, Father's counselor testified that he had told her that he planned to divorce Mother. His counselor verified that he had been talking about getting a divorce since August 2019, almost seventeen months before he testified, but she conceded that she did not know that he was anxious to get it. Father testified that he had not filed a divorce petition yet because he could not afford it. He had "been looking into" filing as a pauper.

Father testified that he had seen Mother more than three times but less than six times since her June 2020 release from jail. He had also texted her a few days before his January 6, 2021 testimony, asking when they could talk about the divorce, and he had last spoken to her the day before he testified. She had called him, and they had

19

talked about divorce plans. Father testified that he would have to talk to Mother to get a pro se divorce but that his talking to her would not affect Joshua. However, the trial court could have found the fact that Father and Mother were still married almost seventeen months after the removal significant. *See In re A.H.*, No. 02-17-00222-CV, 2017 WL 5180785, at *11 (Tex. App.—Fort Worth Nov. 9, 2017, pet. denied) (per curiam) (mem. op.) ("The trial court could have believed that upon their release [from jail], [the parents] would remain a couple and that [the m]other would again fail to protect a child from [the f]ather's violence.").

### 2. Father's Ability to Satisfy Joshua's Needs, Parenting Ability, Plans, and Stability

The caseworker testified that just as Father could not protect Joshua from physical and emotional danger, he could not meet Joshua's present and future physical and emotional needs. In the same vein, she described Father's parenting skills and abilities as "not so good." She based these opinions on his failure to protect his children in the past:

- He had attempted suicide twice while the children were at home.

- He had allowed the children to be exposed to abuse and bad living conditions.

- He had not barred Mother from seeing the children even after he knew she had sexually abused Justin.

- Father had not obtained counseling for Justin.

- Father had not cut Mother out of his life but had maintained contact with her.

20

- He had sent Mother videos of Joshua.

Father's witnesses believed that he would be a good parent for Joshua. Father's roommate testified that he had met Joshua and had seen Father with him. The roommate testified that Father was very attentive and doted on Joshua. Father's counselor testified that he was "[a]bsolutely" interested in Joshua and wanted to be a good parent. She said that Father wanted to regain custody of Joshua and worried about his not having both his parents and about his not knowing his biological family. She stated that nothing about Father indicated that he could not care for Joshua. She admitted, however, that she had never seen Father interact with the children, had never seen his home, had never seem him outside the office setting, and had no firsthand knowledge of his ability to parent. Father's coworker testified that Father was stable and could put Joshua's needs before his own. The coworker believed Joshua should be returned to Father. The coworker was unaware of Father's suicide attempts and had seen Father with his children only on two brief occasions.

In addition to discounting Father's ability to satisfy Joshua's needs and to adequately parent him, the caseworker did not believe that Father could give Joshua a stable home. There was no evidence that the caseworker had visited Father's new home; testimony showed that it was baby-proofed and that Joshua would have his own room. Nevertheless, the caseworker believed Father's choice of roommate and weekly absences made the home unstable. The roommate had a past conviction. Further, even though the caseworker had never met the roommate, Father had given

her a bad impression of him because Father had mentioned to her that the roommate had indicated that he was willing to invest $20,000 in a three-dimensional doll that could serve as a boyfriend or girlfriend. The roommate testified that his conviction was for misdemeanor theft more than five years before trial, and he did not recall a conversation with Father about a sex doll.

The caseworker was also concerned that even though Father had a stable income, he earned it by working out of town four days a week. Additionally, while Father testified that he had "quite a few day care arrangements and sitters [who] help[ed him] out," the two people Father had told her he planned to use as caregivers for Joshua in his absence were unsuitable. Father testified that he was trying to get transferred to a job closer to home and that it should happen soon. In his testimony, he stated that if Joshua were returned to him and if he came home from work each night, which his company would allow, he would take Joshua to daycare at 6:00 a.m. Monday through Friday and pick him up around 5:30 p.m. Father named two different alternate caregivers in his testimony, not the names he had disclosed to the caseworker.

Finally, the caseworker believed that Father could not provide Joshua a safe, stable living environment for some of the same reasons she believed Father could not protect and had not protected the child from danger: Father was unstable himself, the house and the children were dirty at the time of removal, and the children had been exposed to inappropriate behavior and trauma in his home.

### 3. Joshua's Desires, the Foster Parents' Parenting Ability, and the Department's Plans

Joshua was not yet three years old at trial and did not testify. When children are too young to express their desires, the factfinder may consider whether they have bonded with their foster parent and have spent minimal time with the parent. *In re J.V.*, No. 02-19-00392-CV, 2020 WL 1540865, at *6 (Tex. App.—Fort Worth Apr. 1, 2020, no pet.) (mem. op.). Although the caseworker conceded that she saw good interactions between Father and Joshua in their weekly visits, the evidence showed that because of Father's work, Joshua had seen Father mainly on weekends before the removal and that the child had lived in foster care longer than he had lived with Father.

Joshua was bonded to the foster parents (the Fosters), particularly Mrs. Foster, and he had been in the same foster home (along with Charles and Tara) since November 2019, more than a year. The caseworker testified that although he was not that affectionate at first, by the time of trial, he would give Mrs. Foster hugs, they would kiss all the time, and she had taught him how to sign kisses. Additionally, he was very close to Tara and Charles, the half-siblings with whom he was placed. The caseworker testified that separating them would be detrimental to Joshua and that it was in his best interest to keep them together. Father recognized that even if he regained physical possession of Joshua, he would not be able to gain custody of Tara and Charles but was willing to continue the children's relationship through visitation.

23

The caseworker testified that Joshua had made great strides since the removal. At the time of trial, he was learning new words, putting sentences together, trying new foods, and had become more energetic. The Fosters were currently giving him a safe and stable living environment, with food, clothing, mental health counseling, one-on-one attention, and extracurricular activities. The caseworker testified that the Fosters had more than adequate parenting skills and abilities and wanted to adopt Joshua, Tara, and Charles. The caseworker also testified that if the Fosters were to adopt Joshua, the Department would provide college tuition at a Texas state college for him and Medicaid and health coverage, therapy, and counseling. The trial court could have reasonably inferred from this testimony that the Department supported adoption by the Fosters. *See, e.g.*, *Pratt v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-11-00060-CV, 2011 WL 2993334, at *6 (Tex. App.—Austin July 21, 2011, no pet.) (mem. op.) ("As summarized above, Johnson presented testimony from which the district court could reasonably infer that the . . . Department had an adoption planned for the children that, according to the district court, was 'very viable[.]'").

### 4. Father's Completion of Services

The caseworker conceded that Father had completed most of the items on his service plan. He had tested negative for drugs and completed a psychological evaluation and was compliant with his prescription medication for depression and seeing a counselor. He testified that he planned to continue seeing his counselor.

24

The caseworker admitted that when the case started, she had told Father, "Here[ are] the things you need to do to get your son back." However, she testified that Father had yet to take any responsibility for the children coming into care, so she did not believe that he was making the kind of progress in counseling that he needed to, despite his having attended counseling since September 2019. Father had told the caseworker that he should have "been there more" for the children, but she testified that he had not addressed the sexual abuse, his allowing it to happen, his failure to prevent it, and his allowing his older children to take drugs and drink alcohol in the home. The caseworker was concerned about Father's lack of accountability because it showed that he could not protect Joshua. Father's continuing a relationship with Mother concerned the caseworker because Mother had traumatized and harmed his children. The caseworker stated that by not distancing himself from Mother, Father had shown that he would not make choices necessary to parent Joshua safely. The continued association could endanger Joshua if Father regained possession. Thus, the caseworker believed that termination was in Joshua's best interest despite Father's progress on the service plan.

Father's counselor testified that she had been treating him almost a year. She testified that Father was taking counseling seriously and was trying to understand what happened and what changes needed to be made. She also testified that Father did take responsibility for endangering the children by leaving them in Mother's care and by not timely reporting the sexual abuse to the police. Father's counselor stated

25

that he had made a lot of progress, but she admitted that he was "not doing exactly as we would hope." She also conceded that the Department's wanting Joshua to have legal permanency as soon as possible made sense.

### 5. Resolution

Father relies on evidence that he was gainfully employed, could provide for Joshua's physical needs, had appropriate housing, and had substantially complied with his service plan to argue that the evidence is legally and factually insufficient to support the trial court's best-interest finding. However, as the factfinder, the trial court could have assigned a greater weight to (1) the evidence demonstrating Father's failure to protect the children in the past and the risk that he would fail to protect Joshua in the future should he regain custody and (2) the evidence showing that Joshua was thriving with the Fosters. *See Bush v. Bush*, 336 S.W.3d 722, 730 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("In a bench trial, the trial court is the sole judge of the credibility of the witnesses, assigns the weight to be given their testimony, may accept or reject all or any part of their testimony, and resolves any conflicts or inconsistencies in the testimony.") (quoting *Rich v. Olah*, 274 S.W.3d 878, 884 (Tex. App.—Dallas 2008, no pet.)); *see also In re T.M.*, No. 02-19-00329-CV, 2020 WL 523272, at *7 (Tex. App.—Fort Worth Feb. 3, 2020, no pet.) (mem. op.) (citing same).

Having reviewed all the evidence according to the appropriate standards of review, *see J.P.B.*, 180 S.W.3d at 573; *C.H.*, 89 S.W.3d at 18–19, 28, we hold that the

26

evidence is legally and factually sufficient to support the best-interest finding against Father. We overrule his sole issue.

## III. INADEQUATE BRIEFING

Within his sole issue, Father asserts that instead of terminating his parental rights, "the [trial] court could have named the [Department] the Permanent Managing Conservator . . . and named [Father] the Possessory Conservator and given him more time to show that he could meet [Joshua's] needs." To the extent that Father intended to separately challenge the trial court's decision by way of this unsupported assertion, we overrule it as inadequately briefed. *See* Tex. R. App. P. 38.1(i); *In re T.T.F.*, 331 S.W.3d 461, 477–78 (Tex. App.—Fort Worth 2010, no pet.) (citing *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) (noting long-standing rule that a point may be waived due to inadequate briefing)). In the interest of justice, we note that the evidence does not satisfy the requisite statutory elements for both denying termination and awarding the Department permanent managing conservatorship of Joshua. *See* Tex. Fam. Code Ann. § 263.404; *In re E.S.C.*, No. 14-04-01160-CV, 2006 WL 1148144, at *8 (Tex. App.—Houston [14th Dist.] Mar. 30, 2006, no pet.) (mem. op.); *cf. In re E.W.*, No. 10-16-00132-CV, 2017 WL 4079713, at *8 (Tex. App.—Waco Sept. 13, 2017, no pet.) (mem. op.) ("A parent's failure to show that he or she is stable enough to parent children for any prolonged period entitles the factfinder to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption. A factfinder may also

27

consider the consequences of its failure to terminate parental rights and that the best interest of the children may be served by termination so that adoption may occur rather than the temporary foster-care arrangement that would result if termination did not occur. The goal of establishing a stable, permanent home for children is a compelling state interest.") (cleaned up).

## IV. CONCLUSION

Having overruled Father's sole issue, we affirm the trial court's judgment.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: July 15, 2021